IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA,

          v.                *     CRIMINAL NO.: WDQ-13-0002

ANTONIO DAVIS

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Antonio Davis (aka "Tank Top")[1] is charged with Hobbs Act
conspiracy and other crimes. Davis has moved to dismiss the
indictment for "law enforcement misconduct"[2] and the Government
has moved *in limine* to admit evidence of predisposition under
Federal Rule of Evidence ("FRE") 404(b). For the following
reasons, Davis's motion to dismiss was denied, and the
Government's motion *in limine* was granted.

I.  Background[3]

In fall 2012, the Drug Enforcement Administration (the
"DEA") received information from the Baltimore Police Department

---

[1] Codefendants Rodney Proctor (aka "Hot Rod"), Michael Johnson
(aka "Merc"), Sean Thornton (aka "Cracks"), and Jazmen Trusty
(aka "Tyrone Brown") have pled guilty. *See* ECF Nos. 58, 64, 80,
86.

[2] The motion was filed jointly by Thornton, Davis, Proctor, and
Trusty. *See* ECF No. 57 at 1, 7.

[3] The facts are taken from the affidavit in support of the
criminal complaints (ECF Nos. 5-1, 10-1, 15-1) and the
Government's opposition to defense motions (ECF No. 68).

(the "BPD") and confidential source 6 ("CS-6")[4] that Davis, Thornton, and Proctor were armed drug traffickers and members of the Black Guerilla Family ("BGF"), active in Baltimore City's Penrose neighborhood. Aff. in Supp. of Crim. Compl. ¶ 7.

On December 12, 2012, at the direction of law enforcement, CS-6 introduced DEA confidential source 8 ("CS-8")[5] to Davis, Thornton, Proctor, and Johnson in Baltimore City. Aff. in Supp. of Crim. Compl. ¶ 8; ECF No. 68 at 2. During the meeting,[6] which lasted about 11 minutes, CS-8 explained that he was a drug trafficker and was looking for assistance in robbing his source of narcotics supply (the "Source") when the Source arrived at a hotel in Baltimore City sometime before Christmas. Aff. in Supp. of Crim. Compl. ¶ 9; ECF No. 68 at 2. CS-8 told the group that the Source would have at least 10 kilograms of cocaine when he arrived. ECF No. 68 at 2. CS-8 offered to split the drugs with whoever helped him to commit the robbery. Aff. in Supp. of Crim. Compl. ¶ 9. CS-8 stated: "all we gotta do, he come down here, I go in with my little cheddar [money], like I'm gonna buy

---

[4] CS-6 has been providing information to "law enforcement" for at least one year. Aff. in Supp. of Crim. Compl. ¶ 6. CS-6 is a member of the Black Guerilla Family ("BGF") and knows Davis, Thornton, and Proctor. ECF No. 68 at 2.

[5] CS-8 has been providing information to the DEA for "several years." Aff. in Supp. of Crim. Compl. ¶ 6.

[6] The meeting was audio-recorded and surveilled. Aff. in Supp. of Crim. Compl. ¶ 8.

some shit [drugs]--he gonna give me some shit [drugs] anyway."
*Id.* One of the defendants responded, "Right." *Id.* CS-8
continued: "[a]ll you gotta do is come in behind me, whop, whop,
whop, we collect 'em, we wrap 'em up, we outta there." *Id.* The
group then discussed whether CS-8 could provide a vehicle for
travel to the robbery. *Id.* CS-8 also explained that he could
leave the hotel room door open as he entered, and the robbery
team could enter the room behind him. *Id.* CS-8 emphasized that
the Source was not violent and only a few "ratchets [guns]" were
necessary because "once you stick it [a gun] in his [the
[S]ource's] face," the Source would surrender the drugs. *Id.*

   Davis, Thornton, Proctor, and Johnson "were all attentive
and participating in the conversation" and "expressed interest
in committing the robbery" at the end of the meeting. *Id.*
After CS-8 left, CS-6 overheard Thornton tell the group that
they would have to kill CS-8 after the job was finished to
eliminate any trail leading back to them. ECF No. 68 at 3.

   On December 17, 2012, Johnson called CS-8[7] to ask whether
CS-8 could provide a vehicle for the robbery. Aff. in Supp. of
Crim. Compl. ¶ 10. CS-8 assured Johnson that, "[t]he ride is
good." *Id.* CS-8 explained that the Source would be coming to
Baltimore in a few days and would be staying for a few weeks.

---

[7] The conversation was recorded. Aff. in Supp. of Crim. Compl. ¶
10.

*Id.* CS-8 explained that, because the Source was staying for an extended period of time, "[h]e coming heavy [would have a lot of drugs]." *Id.* Johnson asked CS-8 if CS-8 had any other sources of supply because he (Johnson) did not have any other sources "to go to." *Id.* CS-8 explained that the Source had cheated him in a recent drug transaction. *Id.* CS-8 then asked Johnson "if everyone was 'on point' [ready, willing, and able to commit the robbery]," because sometimes "people say they want it, but they really don't want it [are not willing to commit the crime]." *Id.* Johnson responded that, "this shit right here [a robbery of a drug trafficker] make my day . . . this my line of work [robbing drug dealers] . . . that's why I'm pretty sure he pulled in the niggers he pulled in." *Id.* Johnson stated that he could not speak for anyone else, but that he was "with that [the robbery] a 100 [100%] committed." *Id.*

The conversation ended with CS-8 telling Johnson to speak to the others and make sure they were ready to commit the robbery. Aff. in Supp. of Crim. Compl. ¶ 10. CS-8 added that all they needed was "a couple j[oi]nts [guns]" and he would provide the car. *Id.*

On December 19, 2012, at the direction of law enforcement, CS-8[8] again met with Davis, Thornton, and Proctor in Baltimore City. Aff. in Supp. of Crim. Compl. ¶ 11. During the meeting,

---

[8] The meeting was audio-recorded and surveilled. *Id.* ¶ 11.

4

CS-8 told the group that the Source would arrive in Baltimore City the next day and the planned robbery could proceed. *Id.* ¶ 12. CS-8 reminded the group that they would split the stolen cocaine, and expressed his plan to convert his share into crack cocaine. *Id.* Thornton responded, "yeah, take that shit straight to the block [sell it on the streets of Baltimore]." *Id.* CS-8 continued, "I'm cooking my shit up [converting the powder cocaine to crack] . . . that's the only way to make money." *Id.* CS-8 then told the group, "make sure everybody ready to dance [ready to commit the robbery]." *Id.* Thornton responded, "[e]verybody down [ready to commit the robbery]." *Id.* Thornton also asked whether the Source would be armed; CS-8 said he did not know, but would meet with the Source to determine the number of people and amount of drugs at the location. *Id.* Thornton responded, "Yeah." *Id.*

Later in the conversation, CS-8 asked the group if anyone was hesitant about committing the robbery, to which Proctor responded, "[m]y family has to eat." Aff. in Supp. of Crim. Compl. ¶ 12. CS-8 concluded the meeting by reminding everyone to answer their phones the next day. *Id.* Davis, Thornton, and Proctor "were all listening attentively and participating in the conversation." *Id.*

On December 20, 2012--the day of the planned robbery--law enforcement provided CS-6 with a car wired for audio- and video-

5

recording. ECF No. 68 at 4. CS-6 picked up Johnson, and the
two men drove to meet Davis, Thornton, and Proctor in West
Baltimore. *Id.* While purportedly waiting for CS-8 to arrive,
CS-6 was arrested under the guise of having an open warrant.
*Id.* CS-6 left the car keys with Davis. *Id.* Davis, Thornton,
Proctor, and Johnson left and picked up Trusty. *Id.* When all
the Defendants were in the car, they--including Trusty--engaged
in "various conversations" "indicating" their knowledge of the
upcoming robbery. *Id.* "Eventually," the Defendants met CS-8,
and told him that CS-6 had been arrested. *Id.* During this
meeting, CS-8 again explained that he planned to call the Source
from the parking lot of a nearby hotel. *Id.* at 4-5; Aff. in
Supp. of Crim. Compl. ¶ 13. The Source would then meet CS-8 and
take him to the room where the cocaine was being stored. ECF
No. 68 at 5. CS-8 stated that he would send a text message
identifying the room number, after which "everything going to be
a go [the robbery could proceed]." Aff. in Supp. of Crim.
Compl. ¶ 13. Davis, who was driving the car, asked for more
detailed directions to the parking lot where CS-8 planned to
meet the Source. *Id.*

     After providing directions, CS-8 asked whether "everybody
still cool with the split, five five [evenly splitting the 10
kilograms of cocaine]." *Id.* Davis answered, "Yeah." *Id.* CS-8
then returned to his car and left the area. *Id.* The video

recording of the interior of the car "shows that (at least) Davis and Trusty (who are both fully visible) are listening attentively to CS-8" and "[n]either appears surprised or concerned by the conversation." *Id.* At no time during or after the conversation did any of the Defendants attempt to leave the car. *Id.*

After CS-8 left, the Defendants discussed that CS-8 was "greedy" for wanting to keep half of the stolen narcotics and expecting the Defendants to split the rest. ECF No. 68 at 5. The Defendants discussed their plans to rob CS-8 and steal his (CS-8's) portion of the drugs and his money. *Id.* Proctor stated, "Gonna have to sit on the fat boy [CS-8]." *Id.* Thornton said, "We gonna take that money. Know what I'm saying," referring to the money CS-8 would have on him to purchase the drugs. *Id.*

As the Defendants followed CS-8 toward the target location, the car was disabled and they were taken into custody. Aff. in Supp. of Crim. Compl. ¶ 14. A search of Johnson yielded a pair of latex gloves, a ski mask, and a black hat. *Id.* A search of Davis yielded a latex glove, two black gloves, and a black mask. *Id.* A search of Proctor yielded a black stocking cap and a loaded .22 caliber pistol. *Id.* A search of Trusty yielded a black stocking cap and a black hat. *Id.* The Defendants were given *Miranda* warnings and "all acknowledged their rights." *Id.*

7

¶ 15. Davis, Trusty, and Johnson "subsequently agreed to be interviewed," whereupon each "independently admitted" that he had planned to participate in a robbery of 10 kilograms of cocaine" and had "understood" that firearms "would be used to facilitate the robbery." *Id.*

On December 21, 2012, criminal complaints were filed against each of the Defendants. ECF Nos. 1, 5, 10, 15, 18. An indictment followed on January 3, 2013. ECF No. 28.[9] On February 8, 2013, trial was scheduled for Monday, August 5, 2013. ECF No. 35.

On May 29, 2013, Trusty moved to suppress statements. ECF No. 44. On May 30, 2013, Thornton moved for leave to file additional motions; to adopt codefendants' motions; for disclosure of FRE 404(b) and 609 material; for disclosure of FRE 801(d)(2)(E) material; to compel prosecution review of witness

---

[9] The indictment contains five counts:
(1) Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a) (Count One);
(2) Conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Two);
(3) Conspiracy to possess firearms in furtherance of a drug-trafficking crime and a crime of violence, in violation of 18 U.S.C. § 924(o) (Count Three);
(4) Possession of a firearm in furtherance of a drug-trafficking crime and a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Four); and
(5) Being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Five).
ECF No. 28. Counts One, Four, and Five also charge aiding and abetting. *Id.* All of the Defendants were charged in all five counts. *See id.*

backgrounds; and for disclosure of FRCr.P 12 material. ECF Nos. 45-47, 49-51. On June 2, 2013, Trusty moved to adopt codefendants' motions. ECF No. 53. On June 3, 2013, Thornton moved to sever. ECF No. 54. On June 11, 2013, Thornton, Davis, Proctor, and Trusty jointly moved to dismiss the indictment for "law enforcement misconduct." ECF No. 57.

On June 20, 2013, Johnson pled guilty to Count One of the indictment. ECF No. 58. On July 22, 2013, Proctor pled guilty to Counts One and Four. ECF No. 64. Also on July 22, the Government timely opposed the remaining Defendants' pretrial motions. ECF No. 68; *see* ECF No. 63.

On July 26, 2013, Trusty moved to preclude the prosecution from using aliases that are "linked in any way" to him at trial. ECF No. 72. On July 29, 2013, Thornton, Davis, Proctor, and Trusty replied in support of the motion to dismiss. ECF No. 74. On July 30, 2013, Trusty moved to sever. ECF No. 76.

On August 2, 2013, Thornton pled guilty to Counts One and Four of the indictment. ECF No. 80. On August 5, 2013, Trusty also pled guilty to Counts One and Four. ECF No. 86.

II. Analysis

  A. Davis's Motion to Dismiss the Indictment for Law
     Enforcement Misconduct

Davis moved to dismiss the indictment as "insufficient as a matter of law" because of "law enforcement misconduct and

9

overreach." ECF No. 57 at 1. Specifically, Davis argued that
it was factually and legally impossible for him to commit the
crimes charged, which "had no existence beyond the blandishments
and inducements offered by law enforcement." *Id.* "In essence,
CS-8 reduced each of the [D]efendants to the status of a
government agent, each as a catspaw to induce the participation
of the others in a group action which they likely . . . would
not have undertaken had it involved only independent action."
*Id.* at 3. Davis's motion raised three related, albeit distinct,
challenges to the Government's conduct: impossibility, violation
of Due Process, and entrapment.

1. Impossibility

Factual impossibility exists "where the *objective* is
proscribed by the criminal law but a factual circumstance
unknown to the actor *prevents* him from bringing it about."
*United States v. Hamrick*, 43 F.3d 877, 885 (4th Cir. 1995)
(emphases added) (internal quotation marks omitted), *cert.
denied*, 516 U.S. 825 (1995) (mem.). By contrast, legal
impossibility is when the defendant's acts, "even if fully
carried out as intended, would not constitute a crime." *Id.*

Courts "routinely reject factual impossibility defenses
absent a strong indication of congressional intent to allow
them." *United States v. Moore*, 92 F.3d 1183 (Table), 1996 WL
452423, at *3 (4th Cir. 1996). The Fourth Circuit has held that

factual impossibility is not a defense to the crime of conspiracy. *United States v. Min*, 704 F.3d 314, 321 (4th Cir. 2013), *cert. denied*, 133 S. Ct. 2752 (2013); *see also, e.g.*, *United States v. Corson*, 579 F.3d 804, 810 (7th Cir. 2009) ("Though it might seem odd, the fact that the stash house, the drugs--indeed the whole plot--was fake is irrelevant. That the crime agreed upon was in fact impossible to commit is no defense to the crime of conspiracy. The crime of conspiracy is the agreement itself." (internal citation omitted)).

As discussed above, Davis contended that "consummation" of the crimes charged was "impossib[le]," because the crimes "had no existence beyond the blandishments and inducements offered by law enforcement." ECF No. 57 at 1. To the extent that Davis asserts a defense of legal impossibility, he is incorrect: the robbery could have been committed had he and his codefendants forcibly stolen drugs from the Source in the hotel. And, although it was *factually* impossible for Davis to commit the robbery--because neither the individual target of the robbery, nor the drugs Davis intended to steal, actually existed--he cannot succeed on the defense, which does not apply to conspiracy crimes. *Min*, 704 F.3d at 321.

2. Due Process Violations

Davis next argued that the Government's attempt to "lure [him] into criminal activity without a reasonable basis to

11

believe that [he] w[as] involved in such" was "outrageous governmental conduct." ECF No. 74 at 2. This category of constitutional violations first arose in *United States v. Russell*, 411 U.S. 423 (1973). In *Russell*, the criminal defendant argued outrageous government conduct when an undercover agent supplied narcotics manufacturers with a legal, but difficult to obtain, chemical that was essential to manufacturing methamphetamine. *Id*. at 431. After rejecting the defendant's claim to an entrapment defense, the Supreme Court also denied a Due Process claim, explaining:

> [w]hile we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, . . . the instant case is distinctly not of that breed.

*Id*. at 421-32. Application of this constitutional theory was limited in *Hampton v. United States*, 425 U.S. 484 (1976). In *Hampton*, a government informant allegedly sold heroin to the defendant, who later sold it to government agents. Although acknowledging that "the Government . . . played a more significant role in enabling petitioner to sell contraband in this case than it did in *Russell*," *id*. at 489, the Court rejected the defendant's claim that his due process rights were violated, *id*. at 490, stating:

> [i]f the result of the governmental activity is to implant in the mind of an innocent person the

disposition to commit the alleged offense and induce
its commission, the defendant is protected by the
defense of entrapment.    If the police engage in
illegal activity in concert with a defendant beyond
the scope of their duties the remedy lies, not in
freeing the equally culpable defendant, but in
prosecuting the police under the applicable provisions
of state or federal law.

*Id.* at 490 (plurality opinion) (internal citation omitted).
Citing *Hampton*, the Fourth Circuit has since held that the
"outrageous conduct" doctrine "survives in theory, but is highly
circumscribed." *United States v. Hasan*, 718 F.3d 338, 343 (4th
Cir. 2013). Indeed, the Fourth Circuit has *never* held, in a
specific case, that the Government violated a defendant's rights
through outrageous conduct. *Id.*

Here, Government informants presented a criminal
opportunity to the Defendants, which they accepted. This
circumstance is neither "shocking" nor "offensive to traditional
notions of fundamental fairness." *United States v. Osborne*, 935
F.2d 32, 37 (4th Cir. 1991) (internal quotation marks omitted);
*cf., e.g., United States v. Velasquez-Lopez*, 510 F. App'x 559,
560-61 (9th Cir. 2013) ("That the government agent provided an
opportunity for . . . individuals to engage in criminal activity
similar to what he believed they had done before does not shock
the universal sense of justice mandated by the Due Process
Clause of the Fifth Amendment." (internal quotation marks
omitted)).

### 3. Entrapment

Even if law enforcement's conduct "survives constitutional analysis," Davis argued that it "cannot survive judicial scrutiny as a matter of 'sound public policy.'" ECF No. 74 at 3. "It is settled law that the government may provide the opportunities or facilities for the commission of an offense by one otherwise predisposed to criminal activity." *Osborne*, 935 F.2d at 37. Thus, "[u]nlike the constitutional defense of outrageous government conduct, where the focus is on the action taken by the government, the statutory defense of entrapment centers inquiry on the issue of the defendant's predisposition to commit the crime in question." *Id.*; *see also Mathews v. United States*, 485 U.S. 58, 63 (1988) (predisposition is "the principal element in the defense of entrapment" (internal quotation marks omitted)).

An entrapment defense has two elements: government inducement and the defendant's lack of predisposition to commit the crime. *See United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993). Entrapment is an affirmative defense, and the defendant has the initial burden to "produce more than a scintilla of evidence that the government induced him to commit the charged offense," *id.*; then, the burden shifts to the Government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime, *United States v. Jones*, 976

14

F.2d 176, 179 (4th Cir. 1992). A defendant is not entitled to
an entrapment instruction unless he can meet this initial burden
of producing some evidence of government inducement. *See
Osborne*, 935 F.2d at 38.

"'Inducement' is a term of art: it involves elements of
governmental overreaching and conduct sufficiently excessive to
implant a criminal design in the mind of an otherwise innocent
party. Solicitation, by contrast, is the provision of an
opportunity to commit a criminal act." *Daniel*, 3 F.3d at 778
(citation omitted). A showing of mere government solicitation
is insufficient to merit an entrapment instruction because
"solicitation by itself is not the kind of conduct that would
persuade an otherwise innocent person to commit a crime, or that
would be 'so inducive to a reasonably firm person as likely to
displace mens rea.'" *Osborne*, 935 F.2d at 38 (citations
omitted).

"Predisposition" refers to the defendant's state of mind
before government agents make any suggestion that he shall
commit a crime. *Osborne*, 935 F.2d at 38. However, "a finding
of specific prior contemplation of criminal conduct is not
required in order to determine that the defendant was
predisposed." *Id.* Instead, "predisposition is found from the
defendant's ready response to the inducement offered. It is
sufficient if the defendant is of a frame of mind such that,

15

once his attention is called to the criminal opportunity, his
decision to commit the crime is the product of his own
preference and not the product of government persuasion." *Id.*

"In summary, an entrapment claim can only prevail whe[n]
the Government's deception actually implants the criminal design
in the mind of the defendant." *Osborne*, 935 F.2d at 38
(internal quotation marks omitted).

Davis has failed to satisfy either element. As to
inducement, there is no evidence that law enforcement engaged in
"excessive" overreaching; instead, the available evidence
strongly suggests that confidential sources merely presented a
criminal opportunity, which Davis and his codefendants elected
to pursue. *See Daniel*, 3 F.3d at 778. Davis argued that the
Government failed to carry its burden of showing predispo-
sition, because "[t]here was no legitimate, substantiated[,] and
corroborated information which would permit law enforcement to
believe these individuals were involved as a group in the types
of crimes into which they were induced by the actions of law
enforcement." ECF No. 74 at 2. However, the Government has
offered evidence that the Defendants, including Davis, were
willing and even eager to commit the proposed robbery. *See*
*United States v. Hunt*, 749 F.2d 1078, 1085 (4th Cir. 1984)
("Predisposition may be found from a defendant's ready response
to the inducement offered.").

16

4. The Remedy

Even if there were evidence of entrapment or impossibility, dismissal of the indictment would have been an unnecessarily dramatic remedy. *See, e.g.*, *Osborne*, 935 F.3d at 38 ("The question of entrapment is generally for the jury, because it raises the issue of whether the criminal intent originated with the defendant or with the government's agents."); *id.* ("[T]he pretrial resolution of alleged entrapment, intertwined as it is with the issue of intent, is seldom appropriate."). Davis will have ample opportunity to challenge the Government's conduct by, *inter alia*, seeking an entrapment instruction, and moving under Rule 29 for a Judgment of Acquittal.

Thus, Davis's motion to dismiss the indictment was denied.

B. The Government's Motion *in Limine* to Admit Evidence of Predisposition Under Rule 404(b)

The Government sought to introduce Davis's criminal record[10] and evidence of other criminal conduct to rebut Davis's claim of entrapment. ECF No. 77. Specifically, the Government sought to present evidence that Davis is a member of the BGF, who came to law enforcement's attention after a cooperating source--who will testify at trial--told investigators that Davis had participated in BGF plans to kidnap drug traffickers' children for ransom.

---

[10] According to the Government, Davis has been convicted of attempted second degree murder, first-degree assault, and use of a firearm in connection with those crimes. ECF No. 78 at 4.

ECF No. 78 at 3. The Government further sought to present witness testimony that Davis is a drug trafficker who--with Thornton--operated a "drug shop" in the area where the Source meetings took place, earning about $6000 per day in heroin sales. *Id*. "The witness" will testify that Davis's BGF "bubble" or regime had access to firearms, including a .22 caliber handgun. *Id*. "The witness" will also testify that he has observed Davis commit armed robberies of other drug dealers and customers, which included the use of firearms and whippings. *Id*. at 4. Finally, "[t]he witness" will testify that Davis stated he knew someone who would buy the entire load of drugs, including those stolen from CS-8. *Id*.

Under FRE 404(b)(1), evidence of a crime, wrong, or other act is inadmissible to prove a person's "character," in order to show that on a particular occasion, the person acted in accordance with the "character." However, under FRE 404(b)(2), such evidence *may* be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

To be admissible under the Rule, evidence must be "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir. 2008) (internal quotation marks omitted). "Evidence is necessary whe[n] it is an essential part of the crimes on trial,

or whe[n] it furnishes part of the context of the crime."
*United States v. Byers*, 649 F.3d 197, 209 (4th Cir. 2011)
(internal quotation marks omitted). Evidence is reliable if a
jury could reasonably find, by a preponderance of the evidence,
that the act was committed by the defendant. *Huddleston v.
United States*, 485 U.S. 681, 690 (1988); *United States v.
Hadaway*, 681 F.2d 214, 218 (4th Cir. 1982). "Additionally, the
probative value of the evidence must not be substantially
outweighed by the danger that it will cause unfair prejudice."
*United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004)
(*citing* FRE 403).

The Government argued that Davis's predisposition is
"necessary" to the Court's determination whether to give an
entrapment instruction. ECF No. 78 at 2. "Moreover, if the
instruction is given, [Davis's] predisposition is an issue for
the jury." *Id.* "It is clear that the government is permitted
broad latitude under Rule 404(b) to introduce evidence of
relevant prior acts once a defendant has raised a claim of
entrapment[,] thereby putting into issue his predisposition to
commit the crimes with which he is charged." *United States v.
Abulhawa*, 833 F.2d 1006 (Table), 1987 WL 39070, at *1 (4th Cir.
1987) (per curiam).[11]  Davis--by motion and in his opening

---

[11] *See also Sorrells v. United States*, 287 U.S. 435, 451-52
(1932) ("[I]f the defendant seeks acquittal by reason of

statement--raised an entrapment defense. *See supra.*[12] The

Government's proposed evidence shows Davis's predisposition to

commit the charged crimes, including drug trafficking, prior

robberies or kidnappings, access to firearms, and criminal

record. ECF No. 78 at 4. The Court does not believe that the

probative value of the evidence is substantially outweighed by

the danger that it will cause unfair prejudice. *United States*

*v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004) (*citing* FRE 403).

Because the Government's evidence is relevant to issues

other than character (i.e., predisposition), necessary, and

reliable, the motion *in limine* was granted.

---

entrapment he cannot complain of an appropriate and searching
inquiry into his own conduct and predisposition as bearing upon
that issue. If in consequence he suffers a disadvantage, he has
brought it upon himself by reason of the nature of the
defense.").

[12] Counsel stated, *inter alia*, in his opening statement that the
case "began out of the creativeness of federal law enforcement
officers," who acted "for the sole purpose of creating this
fictitious robbery and to make arrests of these five young men."
Initial cross-examination was similarly targeted to the theory
of inducement. *Compare United States v. Goodapple*, 958 F.2d
1402, 1407 (7th Cir. 1992) ("When the entrapment defense is
clearly raised in the defense's opening statement and the
entrapment defense obviously materializes through a defendant's
presentation of its own witnesses or through cross-examination
of the government's witnesses, it is not error for the
government to present evidence of predisposition in its case-in-
chief."), *with United States v. McGuire*, 808 F.2d 694, 696 (8th
Cir. 1987) (per curiam) (finding that it was error for the
district court to allow the government to introduce rebuttal
evidence in its case-in-chief in anticipation of an entrapment
defense that was proposed in defense counsel's opening statement
but that never actually materialized).

20

III. Conclusion

For the reasons stated above, Davis's motion to dismiss the indictment was denied, and the Government's motion *in limine* to admit evidence of predisposition under Rule 404(b) was granted.

_____  8/6/13

Date

_____

William D. Quarles, Jr.
United States District Judge